FILED & ENTERED

APR 04 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY cargill    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re:<br><br>EMPIRE LAND, LLC,<br><br>Debtor(s),<br><br>RICHARD K. DIAMOND, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>EMPIRE PARTNERS, INC., a California Corporation,<br><br>Defendant | Case No.: 6:08-bk-14592-MH<br><br>Chapter: 7<br><br>Adv. No.: 6:09-ap-01235-MH<br><br>**MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><u>Continued Hearing Date</u><br>Date: February 18, 2016<br>Time: 10:00 a.m.<br>Courtroom: 303 |

Before the Court is a motion by Empire Partners, Inc. ("Defendant") for Summary Judgment against chapter 7 trustee, Richard K. Diamond ("Plaintiff").

## I. PROCEDURAL BACKGROUND

On April 25, 2008, Empire Land, LLC ("Empire Land"), Aviat Homes, L.P. ("Aviat"), Empire Construction, L.P. ("Empire Construction"), Empire Global Holdings, L.P. ("Empire Global"), Empire Residential Construction, L.P. ("ERC"), Empire Residential Sales, L.P. ("ERS"), Prestige Homes, L.P. ("Prestige"), and Wheeler Land, L.P. ("Wheeler") (collectively "Debtors"), filed voluntary chapter 11 petitions for relief. An order approving joint administration of Debtors' cases was entered on May 5, 2008, which designated Case No. 6:08-bk-14592-MJ (Empire Land) as the lead case. On December 8,

1

2008, Debtors' cases were converted from chapter 11 to chapter 7 and Richard K. Diamond was appointed as the chapter 7 trustee ("Trustee" or "Plaintiff"). An order approving substantive consolidation of Debtors' cases was entered on September 16, 2009 ("Consolidation Order").

On May 12, 2009, Trustee filed a complaint ("Complaint") against Empire Partners, Inc. ("EPI" or "Defendant"), Adv. No. 6:09-ap-01235-MH. Plaintiff's original complaint alleged four fraudulent transfers under federal and state law in the amounts of (1) $9,667,000 ("$9.6 M transfer"), (2) $4,000,000 ("$4 M transfer"), (3) $2,500,000 ("$2.5 M transfer"), and (4) $1,415,032.14 ("$1.4 M transfer"), in addition to various other claims under state law. On April 26, 2010, Plaintiff filed a First Amended Complaint.

On July 30, 2014, Defendant filed the instant Motion for Summary Judgment ("Motion") and on August 21, 2014, Trustee filed his opposition to the Motion ("Opposition").[1]

On March 3, 2015, Trustee filed a Motion for Leave to Amend to File a Second Amended Complaint Withdrawing Certain Claims for Relief ("Motion for Leave"). On December 1, 2015, the Court entered an order granting the Motion for Leave, allowing Trustee leave to file the Second Amended Complaint. On February 23, 2016, Plaintiff filed a Second Amended Complaint.

The hearing on the Motion was originally set for September 10, 2014, and was continued several times. At a continued hearing on March 24, 2015, the Court took the Motion under submission. A

---

[1] The summary judgment record consists of the following: the Motion; Proposed Statement of Uncontroverted Facts ("PSUF"); Declaration of Jeffrey Rosenfeld in Support of Motion ("Rosenfeld Dec."); Declaration of James P. Previti in Support of the Motion ("Previti Dec."); Declaration of Neil Miller in Support of the Motion ("Miller Dec."); Declaration of Larry Day in Support of the Motion ("Day Dec."); Request for Judicial Notice ("Defendant's RJN"); Opposition; opposition to PSUF Statement of Genuine Issues ("SGI"); Evidentiary Objections to the Day Dec., Miller Dec, Previti Dec., and Rosenfeld Dec.; Request for Judicial Notice ("Trustee's RJN"); Declaration of Peter M. Bransten in Support of the Opposition ("Bransten Dec."); Declaration re: Corrected Docket No. 230 (Exhibit J through O to the Declaration of the Bransten Dec; Notice of Filing Exhibits to Expert Witness Reports; reply to Trustee's Opposition ("Reply"), Reply to Trustee's SGI, Replies to Trustee's Evidentiary Objections, Declaration of John Loeb in Support of the Reply ("Loeb Dec."); and Evidentiary Objections to the Bransten Dec., Trustee's RJN, and Notice of Filing Exhibits to Expert Witness Reports; Trustee's Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of Cynthia M. Cohen in Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of Peter M. Bransten in Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of William Haegele in Response to Defendant's Evidentiary Objections to the Expert Reports and Exhibits thereto; Declaration of Timothy P. Sullivan in Response to Defendant's Evidentiary Objections to the Expert Reports and Exhibits thereto; Trustee's Response to Defendant's Evidentiary Objections to Trustee's RJN; Trustee's Response to Defendant's Evidentiary Objections to Notice of Filing Exhibits and Defendant's Objections to Plaintiff's Improper Filing of Documents; Errata to the Declaration of Peter Bransten; a Corrected Declaration of Peter Bransten in Response to Defendant's Evidentiary Objections; reply to Trustee's Response to Evidentiary Objections; Errata to the Declarations of William Haegele and Timothy P. Sullivan; a Corrected Declaration of William Haegele; and Corrected Declaration of Timothy P. Sullivan.

hearing on the Motion was ultimately reset for February 18, 2016, to coincide with the hearing on Defendant's motion for summary judgment in Adv. No. 6:10-ap-01329-MH, at which time the Court had indicated it intended to announce its ruling on the instant Motion.

Having considered the Motion, Opposition, the summary judgment record, the argument of counsel at all of the hearings on the Motion, and for the reasons set forth below the Court will DENY Defendant's Motion in its entirety.

## II. EVIDENTIARY OBJECTIONS

1. As stated at the hearing on November 19, 2014, the Court will: (1) overrule Defendant's Evidentiary Objections to the Notice of Filing Exhibits to Expert Witness Reports; (2) sustain Plaintiff's Evidentiary Objections to the Declaration of James Previti; (3) sustain Plaintiff's Evidentiary Objections to the Declaration of Jeffrey Rosenfeld; (4) sustain Plaintiff's Evidentiary Objections to the Declaration of Larry Day, except to overrule Plaintiff's objection to paragraph 2, lines 6-7 of the Declaration of Larry Day; and (5) overrule Plaintiff's Evidentiary Objections to the Declaration of Neil Miller, except to sustain Plaintiff's objection to paragraph 3, Exhibit A of the Declaration of Neil Miller.

2. As stated at the hearing on January 28, 2015, the Court will: (1) overrule Defendant's Evidentiary Objections to the Declaration of Peter Bransten, except to sustain Defendant's objection to Exhibit W of the Declaration of Peter Bransten; and (2) overrule Defendant's Evidentiary Objections to Plaintiff's Request for Judicial Notice.

## III. FACTUAL BACKGROUND[2]

Defendant is a California corporation with its principal place of business in California, and served as either the general partner or managing member for Empire Global, Aviat, Empire Construction and Empire Land. From the time of formation of each of the entities, James Previti ("Previti") served as a director of Defendant and directly or indirectly controlled all of the legal and equitable interests of each of Empire Global, Empire Land, Aviat, Wheeler Land, ERC, ERS, Prestige, and Empire Construction, until the appointment of Plaintiff as chapter 7 trustee.

---

[2] The following facts are also undisputed.

<u>Debtors</u>

Empire Global was a holding company that had a 99% ownership interest in each of Empire Land and Aviat at all times at issue in the Second Amended Complaint. Aviat was a holding company that had a 99% ownership interest in Prestige and ERC at all times at issue in the Second Amended Complaint. ERC was in the homebuilding business in Arizona. As of March 31, 2008, ERC owned approximately 1,023 residential lots in six different Arizona communities. ERS marketed and sold homes in ERC in Arizona, taking title to them immediately before the sale for Arizona sales tax purposes. Prestige was in the homebuilding business in California.

<u>Anaverde, LLC</u>

Anaverde, a Delaware limited liability company, owned: (i) a master planned, partially entitled residential development in Palmdale, California, comprising of almost 2,000 acres, which includes approximately 5,000 lots; and (ii) an adjacent development commonly known as Chandar planned for 157 single family homesites (collectively, the "Project").

<u>The IndyMac Loan</u>

On or about August 28, 2006, Anaverde entered into a loan agreement with IndyMac Bank F.S.B. ("IndyMac"), where by Anaverde borrowed $89,000,000 and, in connection therewith, Previti and the James Previti Family Trust ("Family Trust") made a limited guaranty. Additionally, on behalf of Empire Land, Defendant made a payment and completion guaranty, and Empire Land represented that it would maintain a minimum liquidity equal to or greater than $10,000,000.

On May 31, 2007, Anaverde and IndyMac entered into an agreement to extend the term of the IndyMac Loan Agreement to August 27, 2009 (the "First Amendment to IndyMac Loan Agreement"). In connection with the First Amendment to IndyMac Loan Agreement, Defendant on behalf of Empire Land, Mr. Previti, and the Family Trust, entered into a Consent and Agreement of Guarantor (the "Amended IndyMac Guaranty"). Also in connection with the First Amendment to the IndyMac Loan Agreement, Mr. Previti and the Family Trust entered into an Amended and Restated Guaranty (the "Amended Previti IndyMac Guaranty").

///

///

## IV. TRANSFERS

A brief description of each of the remaining transfers in the Second Amended Complaint is set forth below:

1. On June 18, 2007, Empire Land transferred $9.6 M to Defendant.  Defendant alleges that the transfer to Defendant was part of a series of transactions where Empire Land was repaying an inter-company loan to Prestige.  Defendant describes the series of transactions as "short term inter-company loans."  Defendant alleges that: (1) Prestige transferred $9.6 M to Empire Land through a series of seven transactions (i) $3,500,000 on May 4, 2007, (ii) $767,000 on May 7, 2007, (iii) $2,000,000 on May 8, 2007, (iv) $750,000 on May 22, 2007, (v) $600,000 on May 23, 2007, (vi) $1,600,000 on May 30, 2007, and (vii) $450,000 on May 31, 2007; (2) with the exception of the $3,500,000, Prestige deposited the monies into Aviat's bank account, which immediately deposited them into Defendant's bank account, which immediately deposited them into Empire Land's bank account; (3) the $3,500,000 was deposited by Prestige directly into Empire Land's bank account; (4) on or around June 18, 2007, Empire Land transferred $9.6 M to Defendant's bank account, which immediately transferred the funds to Aviat's bank account, and finally to Prestige's bank account; and (5) Plaintiff has isolated the one transfer from Empire Land to Defendant (essentially arguing that Defendant was a mere conduit).  Plaintiff alleges that the $9.6 M transfer was not a short term loan, but a capital distribution to Defendant.

2. In June 2007, Plaintiff alleges that Empire Land transferred $4 M to Defendant as a capital contribution.  Defendant alleges that no transfer actually took place but a series of journal entries were made and reversed.

3. On April 16, 2007, Empire Global transferred its interest in a promissory note of approximately $1.4 M to Defendant.  Defendant alleges the transfer was part of a process to convert a loan from Previti to Empire Land into a capital contribution.  Previously, on December 28, 2006, Previti loaned Empire Land $1,500,000 pursuant to the terms of a written Unsecured Promissory Note ("Note").  On January 4, 2007, Empire Land

transferred $131,705 to Previti as partial repayment of the amount due under the Note. Defendant alleges that as of April 30, 2007, the balance owed on the Note was $1,415,032.14. Defendant also alleges that in a non-cash transaction, the $1,415,032.14 owed by Empire Land to Mr. Previti, pursuant to the Note, was converted into a capital contribution such that Empire Land was no longer required to repay the Note. Defendant further alleges that the contribution occurred in four sequential steps such that the Note was transferred from Previti, to the Family Trust, to Empire Global, to Defendant, and then to Empire Land. Last, Defendant alleges that the intent and effect of the transfers of the Note was to relieve Empire Land of the obligation of repaying the Note to Previti; a benefit that Empire Land did receive. Plaintiff argues that Empire Global's books and records reflect a distribution of approximately $1.4 M from Empire Global to Defendant. Plaintiff alleges that the transfers were part of a scheme so it would appear that Empire Land could meet the $10,000,000 liquidity covenant.

## V. DISCUSSION

**Jurisdiction**

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because those claims arise under title 11 of the United States Code ("Bankruptcy Code") and/or are related to a case pending under title 11.

**Summary Judgment**

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id*. at 324. The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). The inference drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valadingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn,

summary judgment is inappropriate. *Sankovich v. Insurance Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Id*. However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact…" *Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "'[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968)).

There is no requirement that the trial judge makes findings of fact, but performs a threshold inquiry of determining whether there is a need for trial. *Id.* at 250. "Because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, on a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Id.* at 255; *Heller Ehrman LLP v. Jones Day (In re Heller Ehrman LLP)*, 2013 Bankr. LEXIS 889, 22-23 (Bankr. N.D. Cal. Mar. 11, 2013). On a motion for summary judgment the court's purpose is issue-finding, not issue-resolution. *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2nd Cir. 1982). If the basic facts are undisputed, but reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied. *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Trial courts may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. *Anderson*, 477 U.S. at 255.

///

///

7

A. <u>Initial Transferee</u>

Defendant alleges that Plaintiff cannot establish that Defendant was an initial transferee with respect to all three transfers, and therefore, Plaintiff cannot recover on his federal fraudulent transfer claims under § 548 (claims 1, 3, 5, 7, 14, 16, 18, 20, 41, 43, 45, and 47), and on his state law fraudulent transfer claims under § 3439.04 (claims 2, 4, 6, 8, 15, 17, 19, 21, 42, 44, 46, and 48).

The Ninth Circuit uses the dominion test to determine whether a party is an initial transferee or a mere conduit. *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1069 (9th Cir. 2006); *In re Bullion Reserve of North America*, 922 F.2d 544, 549 (9th Cir. 1991); *Walsh v. Townsquare Assocs. (In re Montross)*, 209 B.R. 943, 948 (9th Cir. B.A.P. 1997); *Schoenmann v. BCCI Constr. Co. (In re NorthPoint Communs. Group, Inc.)*, 2007 Bankr. LEXIS 4931, 10 (9th Cir. B.A.P. Nov. 7, 2007).

"The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit." *Incomnet*, 463 F.3d at 1071; *NorthPoint*, 2007 Bankr. LEXIS 4931, 12 n.9. The dominion test defines a transferee as one who has "dominion over the money or other asset, the right to put the money to one's own purposes." *Incomnet*, 463 F.3d at 1070; *NorthPoint*, 2007 Bankr. LEXIS 4931, 11. "The focus on 'dominion' is useful for those unusual situations in which legal title to funds and the right to put those funds to use have been separated. There are two primary cases when this may occur: (1) when an entity has legal title as a formal matter, but legally does not have any discretion in the application of funds; and (2) when an entity does not possess legal title, but nevertheless has sufficient authority over the funds to direct their disbursement." *Incomnet*, 463 F.3d at 1073-74. An entity without dominion or control is deemed a "conduit" which is merely a facilitator without sufficient control over the funds passing through its hands to be considered a transferee. *Montross*, 209 B.R. at 948.

In determining whether an entity has dominion over the funds courts have focused on whether the entity has a legal obligation with respect to the funds and whether it received the funds without any restrictions. *See Incomnet*, 463 F.3d at 1075; *NorthPoint*, 2007 Bankr. LEXIS at 13-14. Courts have also examined whether the entity is aware of the funds. *See In re Reeves*, 65 F.3d 670, 677 (8th Cir. 1995) (corporation did not have dominion over funds where corporation was unaware of transfer);

8

*Montross*, 209 B.R. at 949 (court found that Townsquare was not a transferee where funds were being laundered by one partner, and the funds were never used by Townsquare and none of the other partners where aware of the existence of the funds).

Other circuits, outside the Ninth Circuit have adopted the more lenient "control" test, where the entire transaction is viewed as a whole to determine who truly had control of the money. *Incomnet*, 463 F.3d at 1070. In *Chase & Sanborn Corp.*, the Eleventh Circuit stated that under the control test, courts must step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1197-98 (11th Cir. 1988). In comparing the two tests, "[t]he dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit," whereas "[t]he control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." *Incomnet*, 463 F.3d at 1077 (internal citations omitted).

Here, with respect to the $9.6 M and $1.4 M transfers,[3] Plaintiff has presented evidence that Empire Land and Empire Global transferred funds to Defendant [*See* Bransten Dec. Exhibits F, R, and DD]. Exhibit F includes Empire Land's bank account statement, which reflects a withdrawal of $9.6 M and Defendant's bank account statement, which reflects a cumulative deposit of $9.6 M. Exhibit R is Empire Land's tax return, which reflects a distribution of $13,667,789, which Plaintiff alleges includes the $9.6 M transfer. Exhibit DD is an Empire Global's tax return, which reflects a distribution in the amount of $1.4 M.

While the parties dispute the characterization of the transfer (short term loan v. distribution), neither party has provided evidence whether Defendant had a legal, contractual, or any other obligation to use the funds, or otherwise received the funds with any restrictions. Additionally, the Court notes that the evidence indicates that Defendant may have been the entity behind the transfers (as the managing partner or member of Empire Land and Empire Global) and as such, the inference can be drawn that it had the ability to use the funds as it saw fit (whether it was holding legal title to the funds, or causing the funds to be transferred between the Debtors). Thus, drawing all inferences in a light most favorable to

---

[3] Defendant does not dispute the identity of the transferee with respect to the $4 M transfer because it alleges that no transfer actually took place. *See* Motion, page 13, n.3.

the opposing party, the Court finds a material issue of fact exists as to whether Defendant could use the funds as it saw fit, and thus, under the dominion test, whether it was a transferee of the funds.

<u>Substantive Consolidation</u>

Defendant alleges with respect to the $9.6 M and $4 M transfers that no transfer actually occurred. With respect to the $4 M transfer, Defendant argues that there is nothing that would constitute a transfer because no money was actually moved and there was nothing of value that was transferred.

Section 101(54)(D) defines transfer as each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property. 11 U.S.C. § 101(54)(D). The term transfer under Section 101(54) is to be broadly construed. *Morrissy v. Dereve (In re Dereve)*, 381 B.R. 309, 326 (Bankr. N.D. Fla. 2007). Transfer under § 101(54) includes a withdrawal from a bank account. *In re Bernard*, 96 F.3d 1279 (9th Cir. 1996) (debtor's withdrawal of cash from a bank account constituted a transfer because the debtor parted with a claim against the bank in exchange for the cash); *Haag v. Northwestern Bank (In re Haag)*, 2014 U.S. App. LEXIS 16030 (9th Cir. Aug. 20, 2014). "Within the context of a fraudulent transfer, the definition of transfer is sufficiently broad to include a transfer that results in a **modification of form** or value of property transferred or a deposit into or withdrawal from a bank account." *Towers v. United States, Dep't of Treasury, IRS (In re Feiler)*(**emphasis added**), 218 B.R. 957, 960 (Bankr. N.D. Cal. 1998). S*ee Bernard*, 96 F.3d at 1283; *In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1021 (Bankr. N.D. Cal. 1993); *2-101 Collier on Bankruptcy P* 101.54 (16th ed. 2015). "Money deposited in a debtor's bank account, over which the debtor exercises control, is property of the debtor. By contrast, property held in trust for another does not become property of the estate. The burden of establishing a trust relationship lies with the claimant when property of the estate is alleged to be held in trust." *Easyriders, Inc. v. Bayview Commer. Leasing (In re Easyriders, Inc.)*, 2006 Bankr. LEXIS 2445, 18 (Bankr. C.D. Cal. May 18, 2006) (internal citations omitted).

Here, there is evidence that the $4 M transfer was recorded as a distribution from Empire Land to Defendant [*See* Bransten Exhibit R]. Exhibit R is Empire Land's tax return, which reflects a distribution in the amount of $13,667,789, which Plaintiff alleges includes the $4 M transfer. However, there is also

10

evidence that the $4 M transfer was only a re-characterization of a journal entry.[4] As all inferences must be drawn in a light most favorable to the non-moving party, the Court finds Plaintiff has identified sufficient evidence to create a disputed fact whether the $4 M transfer occurred. Additionally, the Court finds Plaintiff's evidence sufficient to establish a disputed fact as to whether Defendant was a transferee with respect to the $4 M transfer, and whether it had dominion over the funds. *See supra* Section A.

With respect to the $9.6 M transfer, Defendant argues that it was not a transfer because Defendant was only a conduit and the funds transferred were not diverted from being available to pay the Debtors' other creditors, as every dime that Defendant received ultimately went back to Debtors. Defendant's argument relies on the Consolidation Order, substantively consolidating the Debtors' estates. Because the Debtors were substantively consolidated, Defendant believes that the series of transactions should be examined at as a unit.

Defendant primarily relies on a central district case, which the Ninth Circuit remanded to the Ninth Circuit Bankruptcy Appellate Panel with instructions to affirm, *In re Parkway Calabasas, Ltd*. 89 B.R. 832 (Bankr. C.D. Cal. 1988), *rev'd sub nom. Gill v. Sierra Pac. Const*., No. 88-1993 (9th Cir. B.A.P. filed Dec. 11, 1990), *rev'd*, 949 F.2d 1058 (9th Cir. 1991). In *Calabasas*, the bankruptcy court analogized substantive consolidation to a merger of two corporations under state law and held that the substantive consolidation of the two bankruptcy cases resulted in a single case, a single estate, and a single body of creditors. *Id*. at 836, 840. The court reasoned that the purpose of fraudulent transfer law was to protect the asset base of a debtor for the benefit of unsecured creditors and if the Debtors were substantively consolidated, the harm to one debtor's creditors from a fraudulent transfer would be eliminated. *Calabasas*, 89 B.R. at 839.

The Court is not persuaded by Defendant's argument. First, *Calabasas* is factually distinguishable from the instant case because it dealt with an alleged fraudulent conveyance where debtors had been substantively consolidated, and, specifically, where one debtor paid the defendant for a debt owed by another debtor. *Calabasas*, 89 B.R. at 834. Here, the nature of the transfers is disputed

---

[4] The Court notes, but without deciding, that under the Bankruptcy Code's broad definition of transfer, the re-characterization of the journal entry may constitute a transfer.

11

(short-term loan v. distribution), and neither party has alleged that the transfer of the funds was payment for a debt owed by another debtor.

Next, the plaintiff in *Calabasas* only alleged constructive fraudulent conveyance claims. *Id.* at 836, 838-839. Here, Plaintiff has alleged both intentional and constructive fraud claims, and the Court does not find *Calabasas*' reasoning applicable or persuasive to Plaintiff's intentional fraud claims. Among other things, 11 U.S.C. § 548(a)(1)(A) and Cal. Civ. Code § 3439.04(a)(1) do not require an analysis of whether funds were ultimately transferred back to that debtor, or another, later consolidated debtor, or whether the transferring debtor's creditor body was harmed by the intentional fraud. The Court also finds the reasoning in *Calabasas* distinguishable here, because Plaintiff alleges the transfers were capital distributions, <u>and</u> not repayment of a debt as in *Calabasas*.[5] Thus, to the extent the transfer was a distribution, it appears that both Empire Land's creditors and the Debtors' substantively consolidated creditor body may have been harmed, because neither Empire Land nor Debtors' consolidated estate may have received reasonably equivalent value. *See Calabasas*, 89 B.R. at 838 (the purpose of fraudulent transfer law is to protect the asset base of a debtor for the benefit of unsecured creditors). *See also* discussion *infra* regarding Reasonably Equivalent Value in Section V. C.

Last, the Court does not find *Calabasas* helpful in analyzing whether or not a transfer took place. As set forth above, Defendant's approach to view the series of transactions as a whole appears to follow the control test, which is not followed by the Ninth Circuit. The Ninth Circuit has explicitly adopted the dominion test, which examines whether the entity who received the transfer had legal title to the property and could have used the funds/property any way it wanted. As set forth above, the Court finds that there is a disputed fact whether Defendant had dominion over the funds. *See supra* Section A. Thus, the Court finds there is a disputed fact whether the $9.6 M transfer took place.

///

///

///

---

[5] In Calabasas, the court reasoned that the creditors of the debtor who made the payment were harmed, and the creditors of debtor whose debt had been paid were unjustly enriched, but a merger of the two debtors eliminated the harm to the one creditor body and the unjust enrichment to the other. *Calabasas*, 89 B.R. 839.

B. <u>Intent to Hinder, Delay or Defraud</u>

Defendant argues that Plaintiff cannot succeed on his intentional fraud claims because Plaintiff cannot prove actual intent to hinder, delay, or defraud a creditor. Plaintiff may avoid a transfer of the debtor in property, if the debtor made such transfer with actual intent to hinder, delay, or defraud a creditor. 11 U.S.C. § 548(a)(1)(A); *Cal Civ. Code* § 3439.04(a)(1). "Because there is rarely direct evidence of actual fraud, courts look to circumstantial evidence, and frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized badges of fraud." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805-806 (9th Cir. 1994); *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 722 (Bankr. N.D. Ill. 2006).

The Ninth Circuit has identified the most common circumstantial indicia of fraudulent intent at the time of the transfer as: "(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer." *Acequia*, 34 F.3d at 806. "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id.*

Under § 3439.04(b) the following factors that may be considered to determine actual intent set forth under § 3439.04(a)(1):
   (1) Whether the transfer or obligation was to an insider.
   (2) Whether the debtor retained possession or control of the property transferred after the transfer.
   (3) Whether the transfer or obligation was disclosed or concealed.
   (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
   (5) Whether the transfer was of substantially all the debtor's assets.
   (6) Whether the debtor absconded.
   (7) Whether the debtor removed or concealed assets.
   (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
   (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
   (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
   (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

*Cal. Civ. Code § 3439.04(a)(1).*

### 1. $9.6 M and $4 M Transfers

Here, on one hand, there is no evidence of actual or threatened litigation against Empire Land, or that Empire Land retained possession or control of the funds. On the other hand, Plaintiff has provided evidence of Empire Land's insolvency at the time of the transfers [*See* William Haegele "Haegele" and Timothy Sullivan "Sullivan" Reports] and of a special relationship between Empire Land and Defendant (Defendant was Empire Land's managing member) [*See* Bransten Dec. Exhibits D, F, Q, S, Z, and PSUF #5]. Plaintiff relies on the expert reports of Haegele and Sullivan to establish the debtors' (Empire Land and Empire Global) insolvency. Haegele relies on the Sullivan Report in reaching his conclusion that Empire Land was insolvent by December 31, 2006. *See infra* Section E. 2 regarding Empire Land's insolvency. Exhibits D, F, Q, and S are e-mails between Larry Day[6] and Ken Ogren[7] and the Memo from Ken Ogren, which all indicate in order to make liquidity covenants with IndyMac true, it was necessary to effect a short-term "borrowing", and as a result of the "loans" Empire Land was able to satisfy the liquidity covenants. Moreover, the facts reflect that the transfers occurred shortly before substantial debt was incurred. Drawing all logical inferences in favor of Plaintiff, the Court finds that Plaintiff has produced sufficient evidence regarding badges of fraud to raise a disputed fact as to intent to hinder delay or defraud creditors as to transfers from Empire Land ($9.6 M transfer and $4 M transfer).

### 2. $1.4 M Transfer

Similarly, there is no evidence of actual or threatened litigation against Empire Global, or that Empire Global retained possession or control of the funds. However, Plaintiff has presented evidence of Empire Global's insolvency [*See* Haegele and Sullivan Reports]. *See* Section E. 2 *infra* regarding Empire Global's insolvency. Additionally, a special relationship existed between Empire Global and Defendant because Defendant was Empire Global's general partner [PSUF #2]. More importantly, as

---

[6] Larry Day was the Executive Vice President & Chief Legal Officer, and Secretary of Defendant [Answer filed 4/6/12, Docket No. 105, Adv. No. 6:10-ap-01319].

[7] Ken Ogren worked for Lipsey, Yougren, Means, Ogren & Sandberg, LLP, who were employed by Debtors to serve as tax accountants [Order Granting Application to Employ Lispey, Yougren, Means, Ogren & Sandberg, LLP entered on 8/12/2008, Docket No. 305, Case No. 6:08-bk-14592].

14

set forth above, the e-mails between Larry Day and Ken Ogren and the Memo from Ken Ogren discuss that in order to make liquidity covenants with IndyMac true, it was necessary to effect short-term "borrowing", and as a result of the "loans" Empire Land was able to satisfy the liquidity covenants (the $1.4 M transfer by Empire Global was allegedly included in a series of transactions, which reduced Empire Land's liabilities by approximately $1.4 M). Moreover, the facts reflect that the transfers occurred shortly before substantial debt was incurred. Again, drawing all logical inferences in favor of Plaintiff, the Court finds that Plaintiff has produced sufficient evidence regarding badges of fraud, to raise a disputed fact as to intent to hinder delay and defraud creditors as to the $1.4 M transfer from Empire Global.

### C. Reasonably Equivalent Value

Defendant argues that Plaintiff cannot succeed on his constructive fraud claims because Plaintiff cannot prove that Debtors did not receive reasonably equivalent value for the transfers. This argument stems from Defendant's previous argument that there were no transfers with respect to the $9.6 M and $4 M transfers because the Debtors were substantively consolidated. Defendant immediately gave the $9.6 M transfer to Aviat (Empire Land's substantively consolidated co-debtor), which Defendant alleges was part of a series of inter-company loans. With respect to the $4 M transfer, Defendant argues that the ledger entries, which the Trustee alleges are actionable, were reversed at the same instant, so that whatever theoretical "value" was transferred went first in one direction and then the next instant reversed and immediately flowed back, resulting in, if anything, an exchange of identical value. As to the $1.4 M transfer, the Note received by Defendant was ultimately given to Empire Land (Empire Global's substantively consolidated co-debtor).

Whether or not reasonably equivalent value was provided in exchange for a transfer is a question of fact. *Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, 2006 Bankr. LEXIS 4600, 38-39 (Bankr. S.D.N.Y. Mar. 6, 2006). "It is far from established that the direct satisfaction of antecedent debt is the only way of ascertaining reasonably equivalent value, however. In determining value, the Court makes a twofold inquiry: whether the debtor received any value at all in exchange for the transfer; i.e. any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent to the cash transferred by the

debtor." *Id*. However, a distribution on account of a partnership interest relative to an investor's capital contribution is not "reasonably equivalent value" as defined by the Bankruptcy Code. *AFI Holding, Inc. v. Mackenzie*, 525 F.3d 700, 704 (9th Cir. 2008) (citing *In re Agricultural Research & Tech. Group, Inc.*, 916 F.2d 528, 540 (9th Cir. 1990)). Additionally, "[d]ividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value." *5-548 Collier on Bankruptcy P* 548.05 (16th ed. 2015).

Here, while Defendant alleges and has provided evidence that the transfers were inter-company loans, Plaintiff has provided evidence that the transfers were contributions or distributions [*See* Bransten Dec. Exhibits D, F, Q, R, S, V, Z, and DD]. The Court finds that there is a disputed fact as to the characterization of the transfers, and in order to determine whether or not debtors (Empire Land and Empire Global) or Debtors received reasonably equivalent value, the nature of the transfers must be established. Thus, as there is a dispute of fact regarding the characterization of the transfers, the Court finds that Plaintiff has set forth sufficient evidence to establish a disputed fact whether debtors (Empire Land and Empire Global) or Debtors received reasonably equivalent value for the transfers.

D. <u>Insolvency</u>

Defendant argues that Plaintiff cannot meet his burden in proving that Debtors were insolvent at the time of the alleged transfers. In order to prove a claim under 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I) and Cal. Civ. Code § 3439.04(b)(2), Plaintiff must establish that debtor was insolvent at the time of the transfer, or became insolvent as a result of the transfer. Additionally, insolvency is identified as a badge of fraud to support a claim under 11 U.S.C. § 548 (a)(1)(A) and Cal. Civ. Code § 3439.04(a)(1). As set forth above, Plaintiff relies on the expert reports of Haegele and Sullivan to establish debtors' (Empire Land and Empire Global) insolvency.

  *a. Credibility of Haegele*

Defendant questions the reliability of Plaintiff's expert report by Haegele, and requests that the Court exercise its gate keeping function and exclude Haegele's report because Haegele's methodology in determining Empire Land and Empire Global's insolvency is flawed. Specifically, Defendant objects to Haegele's report because he examined the insolvency of the certain debtors on an individual basis

instead of all Debtors on a consolidated basis, it does not appear he considered the actual sale price of Anaverde, and he double counted the Wachovia Loan.

Initially, the Court notes that Defendant does not provide any evidence to challenge or controvert Haegele's report. Thus, Defendant's arguments regarding the credibility of the Haegele report ask the Court to weigh the credibility and attack the methodology of Haegele's report, without any contradictory evidence.[8] Thus, the Court finds Defendant's arguments alone, without any supporting evidence, are insufficient to exclude the Haegele report at this stage. Moreover, the Court finds that weighing the credibility of the Haegele report not an issue appropriate to be resolved in this Motion.

Next, the Court is unpersuaded by Defendant's argument that Plaintiff must establish the insolvency of the Debtors on a substantively consolidated basis versus an entity by entity basis. Defendant's argument is primarily premised on the fact that Debtors' bankruptcy cases were substantively consolidated by the Consolidation Order, and as such, by operation of law the Consolidation Order requires Plaintiff to prove Debtors' insolvency on a substantively consolidated basis. However, Defendant has not provided any legal authority in its papers to support this position. Defendant argues that the findings of fact and conclusions of law issued in connection with the Consolidation Order require this Court to examine the Debtors' insolvency on a consolidated basis. While Defendant does not cite any law regarding this position, parties discussed this issue at length at the January 21, 2015 hearing. Plaintiff cites to *Total Technical* to support his argument that insolvency should be examined on an entity by entity basis. *Total Technical Servs., Inc. v. Whitworth*, 150 B.R. 893 (Bankr. D. Del. 1993). In *Total Technical*, even though the two debtors were substantively consolidated, the court determined that it would examine only the insolvency of the debtor who made the alleged preferential transfers. *Id*. at 899-900.

In reaching this conclusion, the court noted that the order substantively consolidating the debtors did not have any findings that the debtors were treated on a consolidated basis **during the period in question** (i.e. the time in which the transfers at issue were made). *Id*. at 900 (citing *Cissell v. First Nat'l*

---

[8] The Court is not making any findings regarding the methodology used by Haegele (whether to consider the actual sale price of Anaverde and whether the Wachovia loan may be double counted); only that Plaintiff has presented sufficient evidence to create an issue for trial.

17

*Bank*, 476 F. Supp. 474, 479 (S.D. Ohio 1979) (court found that the parties had treated the debtors as a consolidated unit **during the period in question**, and thus examined the insolvency of the debtors on a consolidated basis)) (**emphasis added**). Here, while the findings of fact for the Consolidation Order made findings as to the close relationship of the Debtors pre-petition, there is no specific finding as to any date by which the Debtors were deemed treated as "consolidated" until the Petition Date, which was subsequent to the transfers. Thus, the Court finds that neither party has established whether insolvency should be examined on an individual or consolidated basis, because neither party has provided evidence whether Debtors were "consolidated" during the time of the transfers.

      *b. Solvency of Empire Global*

Defendant argues that even if the Court were to consider the Haegele report, it does not opine as to the insolvency of Empire Global and does not set forth the insolvency of Empire Global and Empire Land on the date the alleged transfers occurred.

The Haegele report opines that Prestige was insolvent **by** March 31, 2007, Empire Land was insolvent **by** December 31, 2006, and ERC was insolvent **as of** December 31, 2006, March 31, 2007, and June 30, 2007. Plaintiff argues that because (1) Aviat was a holding company that had a 99% ownership in both Prestige and ERC, Aviat was also insolvent as of March 31, 2007, and (2) Empire Global was a holding company that had a 99% interest in both Aviat and Empire Land, Empire Global was also insolvent as of March 31, 2007 because Empire Land, Prestige, and ERC were all insolvent. Here, drawing all inferences in a light most favorable to the non-moving party, the Court finds that Plaintiff has identified sufficient evidence to create a triable issue with respect to Empire Land and Empire Global's insolvency on the dates of the respective transfers.

E. <u>State Law Claims</u>

Defendant argues that Plaintiff cannot prevail on his claims regarding violation of California limited liability company or partnership law because Plaintiff does not have any evidence to support his claims that a distribution took place. *See Cal. Corp. Code* §§ 15906.09 and 17704.06. As set forth above, the Court finds that Plaintiff has provided evidence to establish a disputed fact as to whether the distributions took place.

Additionally, Defendant argues that even if Plaintiff can establish the transfers occurred, Plaintiff has not produced evidence to show that the transfers are distributions as defined under *Cal. Corp. Code* § 15901.02(f). Section 15901.02(f) defines a distribution as "a transfer of money or other property from a limited partnership to a partner in the partner's capacity as a partner or to a transferee on account of a transferable interest owned by the transferee." *Cal. Corp. Code* § 15901.02(f). Here, Trustee has presented a tax return of Empire Land, which reflects a distribution of $9.6 M and $4 M and a tax return of Empire Global, which reflects a distribution of $1.4 M [*See* Bransten Dec. Exhibits R and DD]. Exhibits R and DD are tax returns for Empire Land and Empire Global respectively, which reflect distributions of the alleged transfers [PSU #2 and 5]. Moreover, as set forth above, the Court finds there is a disputed fact regarding the characterization of the transfers (short term loan v. distribution). Additionally, the Court notes that Defendant was either the managing member or managing partner of Empire Land and Empire Global. Accordingly, the Court finds that Plaintiff has identified sufficient evidence to create a disputed fact that a distribution, as defined under § 15901.02, from Empire Land and Empire Global to Defendant occurred.

###

Date: April 4, 2016

Mark Houle
United States Bankruptcy Judge